# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.

**CRIMINAL COMPLAINT**
CASE NUMBER:
09- M - 536

| | |
|---|---|
| Christine R. Perkins | Melissa D. Bartelme |
| Keith C. Wilson | Christian G. Andrejat |
| Joshua J. Parent | Myles S. Reno |
| Joshua L. Anderson | Michael C. Lecus |
| Jeanette M. Perkins | Angela Perkins |
| Sherry Y. Wilson | Jason J. Tyson |
| Dejuan Rogers | Kelly A. Milke |

I, Matthew Cooper, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From on or about March, 2008, to the present, in Milwaukee County, in the State and Eastern District of Wisconsin, the above-named individuals, knowingly and intentionally conspired to possess with the intent to distribute and distribute in excess of one (1) kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and during such conspiracy death and serious bodily injury resulted from the use of such heroin, in violation of Title 21, United States Code, §§ 846, 841(a)(1) and 841(b)(1)(A) and Title 18, United States Code, § 2.

TASK FORCE OFFICER MC
I further state that I am a Detective and ~~Special Agent~~ with the Milwaukee Police Department, assigned to HIDTA, and this complaint is based on the following facts:

Please see the attached affidavit.

Continued on the attached sheet and made a part hereof:  X Yes ___ No

Signature of Complainant
Matthew Cooper

Sworn to before me and subscribed in my presence,

_November 25th 2009_
Date

The Honorable William E. Callahan, Jr.
United States Magistrate Judge
**Name & Title of Judicial Officer**

_at Milwaukee, Wisconsin_
City and State

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Matthew Cooper, having been deputized as a Task Force Officer with the Drug Enforcement Administration and having been duly sworn, depose and state as oath the following:

## I. BACKGROUND AND EXPERIENCE

1. I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 12 years. I have been a Detective for over 6 years and have been assigned to the Organized Crime Division (formerly known as the Vice Control Division) (Narcotics) for the last 5 years. I was previously assigned to the Vice Control Division (Narcotics) as a police officer for over 2 years. I have been assigned to the High Intensity Drug Trafficking Area [HIDTA] for about the last 2 years. During this time I have investigated violations of controlled substance laws [Title 21, U.S.C. Sections 841(a)(1) and 846 and Wisconsin State Statutes Ch. 961] and other related offenses.

2. I have had formal training and have participated in numerous complex narcotics trafficking investigations, including complex conspiracies. Based on my training, experience and participation in drug trafficking investigations and associated financial investigations involving large amounts of heroin, cocaine, crack cocaine, marijuana and/or other controlled substances, I know and have observed the following:

   a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

   b. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine and crack cocaine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

1

c.      I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

d.      I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e.      I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f.      I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

g.      I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

2

h.   I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

i.   I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

j.   I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to:  domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell

3

corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l.    I know drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

m.    I know drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs in their possession.

n.    I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

3.    This affidavit is based upon my personal knowledge and information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, informants, and defendants, whose reliability is established separately herein.

4

4.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

5.    This affidavit is submitted in support of an application for criminal complaints, arrest warrants and search warrants for violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846 (conspiracy to distribute one (1) kilogram or more of heroin) for the target individuals and locations associated with the targeted individuals.

## II.    INDIVIDUALS TO BE CHARGED BY CRIMINAL COMPLAINT ARRESTED

6.    I make this affidavit in support of an application for a criminal complaint and corresponding arrest warrants, charging the following individuals with:

a.    knowingly and intentionally conspired with each other and others to distribute a controlled substance;

b.    The offense involved one (1) kilogram or more of a mixture and substance containing heroin, a Schedule I controlled substance; and

c.    Death and serious bodily injury resulted from the use of the heroin distributed in furtherance of the conspiracy,

all in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), 841(b)(1)(A), and Title 18, United States Code, Section 2:

|   | Name | Alias | DOB | Role |
|---|------|-------|-----|------|
| 1 | Christine R. Perkins | Pooh, PoPoo | xx/xx/1979 | Distributor |
| 2 | Keith C. Wilson | Keith C. Moon, Manny, Ready Man, Fresh | xx/xx/1973 | Distributor |
| 3 | Joshua J. Parent | | xx/xx/1986 | Distributor |
| 4 | Joshua L. Anderson | | xx/xx/1987 | Distributor |
| 5 | Jeanette M. Perkins | Bonnie | xx/xx/1968 | Distributor |
| 6 | Sherry Y. Wilson | Nonnie | xx/xx/1963 | Distributor |

5

| | Name | Alias | DOB | Role |
|---|---|---|---|---|
| 7 | Dejuan Rogers | | xx/xx/1989 | Distributor |
| 8 | Melissa D. Bartelme | Missy | xx/xx/1987 | Distributor |
| 9 | Christian G. Andrejat | | xx/xx/1987 | Distributor |
| 11 | Myles S. Reno | | xx/xx/1987 | Distributor |
| 11 | Michael C. Lecus | | xx/xx/1987 | Distributor |
| 12 | Angela Perkins | | xx/xx/1976 | Distributor |
| 13 | Jason J. Tyson | J.J. | xx/xx/1981 | Distributor |
| 14 | Kelly A. Milke | | xx/xx/1985 | Customer |

## III. LOCATIONS TO BE SEARCHED

7. This affidavit is also submitted in support of applications for search warrants to seek evidence of the crime referenced in ¶ 5 above for the below-listed locations associated with suspects who have committed, are committing and will continue to commit the above offenses:

- a. 3140 North Palmer Street, Milwaukee, Wisconsin. Described as a lower unit of a three-story, two-family residence on the east side of the street between Burleigh and Ring Streets in the City of Milwaukee. Further described as having gray siding, reddish-brown trim and a brown roof. The numbers 3140 appear on the west side of the building to the left of the front door.

- b. 2545 North Buffum Street, Milwaukee, Wisconsin. Described as a two-story, single family residence on the west side of the street between Clarke and Wright Streets in the City of Milwaukee. Further described as having white siding,

6

brown trim and a brown roof. The numbers 2545 appear on the east side of the
building adjacent to the front stairs.

c.  A white 2002 Dodge Intrepid with a black bra, bearing Wisconsin license plates
    717-NJY, VIN: 2B3HD46RX2H252424, listed to Keith Christopher Wilson of 2545
    N. Buffum St., Milwaukee, WI 53212.

d.  A red 1997 GMC Yukon, bearing Wisconsin license plates 712-PRZ, VIN:
    1GKEK13R5VJ739953, listed to Sherry Yvette Wilson of 2545 N. Buffum St.,
    Milwaukee, WI 53212..

As detailed below, there is probable cause to believe that located at the above premises are
items that constitute evidence of the commission of drug trafficking. Such items are detailed
in Attachment A.

## IV.  CONFIDENTIAL INFORMANTS' CREDIBILITY

8.  During various times throughout this investigation, the below-referenced confidential
informants (CI) and sources of information (SOI) provided information to case agents
regarding the drug trafficking activities of the individuals listed in ¶ 2 above and their drug
trafficking associates. I believe the information provided by the CIs and SOIs is truthful and
reliable because the information was consistent with evidence obtained elsewhere in this
investigation, the information was provided against the CIs' and SOIs' penal interest, the
information was provided in order for the CIs' and SOIs' to receive consideration in pending
cases, and/or substantial portions of the source's information have been corroborated through
independent investigation, including recorded conversations.

7

## V. JULY 26, 2008 OVERDOSE DEATH OF NICHOLAS DYBUL

9. On July, 26, 2008, at about 7:24 p.m., law enforcement authorities responded to the Mobil Oasis gas station at 9510 S. 27th Street. In regard to an unresponsive male in a vehicle. Officers located a black 1994 Chrysler Concorde, bearing Wisconsin license plate 169-NED, which was parked on the south side of the Mobil gas station. Wisconsin Department of Transportation records indicated the owner of this vehicle was Nicholas T. Dybul. In the driver's seat of the vehicle, officers located the victim, Nicholas T. Dybul [xx-xx-1985], who was unconscious and unresponsive. Dybul was pronounced dead at 8:30 p.m. by Jennifer Wayd of the Milwaukee County Medical Examiner's Office. On July 28, 2008, an autopsy was performed by Interim Medical Examiner K. Alan Stormo of the Milwaukee County Medical Examiner's Office. Dr. Stormo determined the cause of death to be morphine toxicity due to injection of heroin.

10. During a search of the black Chrysler Concorde, officers located a Newport cigarette package that contained a syringe and a bent spoon, items commonly used for the injection of heroin. Authorities also located a second Newport cigarette package containing a syringe and a spoon in the trunk of the vehicle.

11. Officers interviewed Steven Greenspon, the manager of the Mobil Oasis gas station. Greenspon stated early on the morning of July 26, 2008, he was working at the gas station and remembered a young male, later identified as Nicholas Dybul, enter the men's bathroom of the station and stay there for a long period of time. Greenspon stated he eventually entered the restroom and knocked on the door to the bathroom stall where Dybul was located. Greenspon

8

stated it sounded as if he had woken Dybul. A few minutes later, Dybul exited the bathroom. Greenspon stated Dybul appeared "pasty-looking." Dybul then exited the gas station.

12. Officers later reviewed a July 26, 2008, surveillance video from the gas station and observed Dybul enter the gas station at 8:14 a.m. and exit the station at 8:29 am. The video also showed Greenspon walk toward the bathroom at 8:17 a.m.

13. Officers interviewed Christopher Walters, the manager of Infusino Pizza, which is located inside of the Mobil Oasis gas station. Walters stated he noticed Dybul's vehicle outside the gas station at about 4:00 p.m. and noticed Dybul inside of the vehicle. At about 7:20 p.m., Walters observed Dybul had not moved in quite a while. Walters alerted Paul Yakich, an employee of the Mobil Oasis, and the two of them went to check on Dybul. When they found him without a pulse, they called 911.

14. Officers interviewed Dybul's girlfriend, Kelly Milke. Milke stated between about 9:00 p.m. and 10:00 p.m. on July 25, 2008, she and Dybul were celebrating Dybul's birthday and decided to use heroin. Milke and Dybul began calling their heroin supplier "Josh." Milke was later shown a photo of Joshua J. Parent, a white male, xx/xx/1986, and positively identified Parent as the person that she knew as "Josh." They used Milke's cellular phone, 414-795-4475 [Sprint subscriber records show this phone to be subscribed to by Anne Milke], and Dybul's cellular phone, 414-218-8682 [AT&T subscriber records show this phone to be subscribed to by Carrie Dybul], to call Parent's cellular phone, 414-336-6038 [AT&T subscriber records show this phone to be subscribed to by Tracfone Wireless – GSM with no user name listed]. Milke stated they called several times, but received no answer. They then received a call on Milke's phone

9

from a phone belonging to Joshua Anderson, 414-758-8503 [Verizon Wireless phone records show this phone to be subscribed to by Patricia Hernandez-Putze]. The user of the phone was Joshua Parent. Parent made arrangements to sell heroin to Milke and Dybul at the BP gas station located at W. Layton Ave. and W. Loomis Rd.

15.   Milke and Dybul met Parent at the BP gas station. When they met, Milke purchased three $20 bindles of heroin from Parent. Milke went into the BP gas station and injected one of the bindles of heroin. When she returned to the vehicle, Dybul told her they had been at the gas station for too long. He told Milke to drive to the Citgo gas station that was across the street. Milke did so and when they arrived, Dybul went into the gas station and injected one of the bindles of heroin. Dybul retained possession of the third bindle of heroin. They both returned to Milke's apartment and went to sleep. Milke stated Dybul appeared to be in good health when he went to sleep. When Milke woke up the next morning, Dybul was already gone and Milke believed Dybul had gone to work. Milke told officers she was "100% sure" Dybul was still in possession of the third bindle of heroin. She stated when Dybul purchased heroin, he always purchased a bag for use early the next morning as he stated it "levels him out for the day."

## VI.   HEROIN INVESTIGATION AFTER JULY 26, 2008

16.   On July 28, 2008, Kelly Milke spoke with law enforcement officers and agreed to arrange a heroin transaction with Joshua Parent. At about 11:30 a.m., Milke placed two calls to Parent's cellular phone, 414-336-6038, but received no answer. [Phone records show one phone call placed at 11:23 am with a :34 second duration and another call placed at 11:23 am with a :17

10

second duration.] Milke then used a cellular phone provided to her by law enforcement and again tried to call Parent. The phone was answered by a person that Milke identified as Parent.

17. Milke stated she wanted to meet Parent and he asked how much [heroin] she wanted. Milke stated she wanted "three" [$20 quantities of heroin]. Milke also asked Parent if it was the same heroin she had purchased from him on Friday and he stated that it was. Milke knew this to mean Parent still had heroin remaining from the same source. Milke told Parent she would be able to meet him in thirty (30) or forty (40) minutes and she would call him back. At about 11:54 a.m., Milke received another call from Parent. [Phone records show a call placed to the law enforcement phone at 11:55 am with a duration of :24 seconds]. Parent told Milke to meet him at the Taco Bell restaurant located at S. 76th St. and W. Rawson Av. [7141 S. 76th St., Franklin, Wisconsin] At about 12:06 p.m., Milke received an incoming call from 414-529-1506. She identified this phone as Parent's mother's home phone number. [Phone records show the subscriber for this number to be Harry Parent at 7660 W Windrush Ln., Franklin, WI.] Parent asked when Milke would arrive and she told him it would be two to three minutes. [Phone records show an incoming call to Milke's cellular phone from 414-529-1506 at 12:06 am with a duration of :19 seconds.]

18. Law enforcement officers positioned themselves in the parking lot of Taco Bell, with Milke seated in an undercover vehicle. Approximately five (5) minutes later, a maroon 2005 Honda Accord bearing Wisconsin license plates 514-MZG drove onto the Taco Bell parking lot. A review of Wisconsin Department of Transportation records reveal that the owner of this vehicle is Harry and Joshua Parent at 7660 W Windrush Ln., Franklin, WI. Milke positively

11

identified the driver as Parent and stated this was the same vehicle Parent had driven to the heroin deal on Friday night.

19.     Milke then exited the undercover vehicle and approached the open window of Parent's vehicle. Agents observed Milke handing Parent $60.00 in United States currency that had been given to her by law enforcement. Parent handed Milke three (3) aluminum foil folds containing suspected heroin. Milke then returned to the undercover vehicle and turned the suspected heroin over to law enforcement. At that time, law enforcement officers approached and arrested Parent for a state charge of Delivery of a Controlled Substance – Heroin. A custodial search of Parent revealed a clear plastic baggie in his right front pants pocket which contained an additional 32 aluminum folds of suspected heroin. All of the suspected heroin later tested positive for heroin. The three aluminum folds purchased by Milke contained a total weight of 0.2 grams and the heroin in the 32 additional folds had a weight of approximately 2.4 grams. A sample of the suspected heroin tested positive for heroin.

20.     On July 28, 2008, law enforcement officers went to Parent's residence at 7660 W. Windrush Ln., Franklin, WI, and spoke to Parent's mother, Chris Parent. During a search of the residence, officers located a Motorola Trac phone, 414-336-6038, which Chris Parent stated belonged to Joshua Parent. Officers located Joshua Anderson at the residence. Anderson stated that there were also two hypodermic needles in Joshua Parent's bedroom. Officers located the needles under the bed and also located several spoons that contained residue consistent with heroin usage. Anderson stated he and Parent had been using heroin for the last "couple of months". Anderson knew Parent's heroin source of supply was "Pooh." Agents

12

presented Anderson with a photo of Christine Perkins, and he identified her as the person he knows as "Pooh." Anderson stated that Parent usually purchased about 50 bindles of heroin at a time and he had accompanied Parent on about 20 different occasions when Parent purchased heroin from Perkins.

21.     On July 28, 2008, law enforcement officers also interviewed Joshua Parent. Parent admitted to setting up the heroin transaction with Kelly Milke on Monday, July 28, 2008, and to selling her three bindles of heroin. He also admitted to possessing the additional heroin that was located in his pocket. Parent stated he thought he had 25-35 bindles in his pocket. Regarding Friday, July 25, 2008, Parent stated Milke had called him between 3:00 p.m. and 7:00 p.m., and he later met her at the BP gas station at W. Loomis Rd. and W. Layton Avenue. Parent stated he sold Milke three (3) or four (4) bindles of heroin and Milke then went into the gas station to inject the heroin. Parent could tell that there was another occupant in the vehicle Milke was in, but was unable to identify Dybul as the person who accompanied Milke. Parent positively identified a photo of Dybul's vehicle as the vehicle Milke had been in.

22.     Parent stated his heroin source of supply was "Pooh." Agents presented Parent with a photo of Christine Perkins whom Parent identified as the person he knows as "Pooh." Agents also presented parent with a photo of Keith C. Wilson whom Parent identified as Perkins' boyfriend. Parent stated he had purchased heroin in the past from Wilson, but that the quality was inferior to the heroin purchased from Perkins. Parent also stated he believed Perkins and/or Wilson had a heroin source of supply in Chicago, IL.

13

23. Parent stated he had been purchasing heroin from Perkins for about four (4) months. On Wednesday, Thursday, Friday and Saturday he usually purchased about one hundred (100) bindles of heroin per day from Perkins. On Sunday, Monday and Tuesday he usually purchased about fifty (50) bindles of heroin per day from Perkins. Based upon my training and experience, I am aware that a typical $10 aluminum foil fold of heroin, also known as a "bindle," contains about .10 grams of heroin. Parent stated he last purchased fifty (50) bindles of heroin from Perkins on Sunday, July 27, 2008. Parent used approximately ten (10) to thirteen (13) bindles per day, and the remainder Parent sold to his customers.

24. On July 29, 2008, case agents re-interviewed Joshua Parent. When Parent was informed that Nicholas Dybul had died from an apparent overdose, Parent spontaneously stated, "He didn't die off of my shit, did he?" Parent stated that his cellular phone number was 414-336-6038 and his home phone number was 414-529-1506. Parent identified his initial heroin source of supply as "Myles." [Case agents subsequently identified "Myles" as Myles Reno.] Parent began buying heroin from Reno whom Parent knew purchased heroin from Perkins. Reno would buy thirty (30) to forty (40) bindles per day and sell them in the area of Pick n'Save near Highway 100 and W. Forest Home Avenue. Parent knew Reno lived in the condominiums near Highway 100 and W. College Ave. or W. Rawson Ave. Reno also used heroin and sold it to support his own habit. Parent also provided a phone number for Reno of 414-403-8830.

25. After accompanying Reno on several occasions, Perkins told Parent that he could begin calling her directly. Parent usually bought fifty (50) to one hundred (100) bindles of heroin per day from Perkins for the last three or four months. Parent believed Perkins lived in the area

14

of E. North Ave. and N. Buffum St. Parent would call Perkins on her cellular phone, 414-419-8718. [U.S. Cellular records show the subscriber of this phone to be Sam Doe with an address of 8410 W. Bryn Mawr Ave., Chicago, IL.] I am aware from prior experience that U.S. Cellular lists "Sam Doe" as the subscriber when there is no other subscriber name provided and that the address listed is the corporate address of U.S. Cellular.] Parent would then meet Perkins in the area of N. 67th St. and W. Villard Avenue. Perkins would enter into Parent's vehicle and place a phone call to a supplier to order the heroin. When the supplier arrived in the area, Perkins entered the supplier's car to pick up the heroin. Perkins and the supplier then drove a short distance away, but still within eyesight. Perkins exited the supplier's car and returned to Parent's vehicle. Once inside the vehicle, Perkins counted the aluminum bindles of heroin. Perkins usually kept two bindles for herself and gave the rest to Parent.

26. Parent also identified Missy Bartone (phonetic) as another customer of his. [Case agents identified her as Melissa Bartelme]. He stated Bartelme lived in Greenfield near Southridge Mall and used cellular phone number 414-213-8468. [Law enforcement database records indicate that this number had previously been reported as the contact number for Melissa Bartelme.] Parent had previously stated Bartelme resold the heroin she purchased from him. He stated that Bartelme would usually buy 10-15 bindles per day, and was occasionally accompanied by her boyfriend. Parent stated her boyfriend had previously been arrested for involvement with Oxycontin. Parent stated that Bartelme drove a black Chevrolet Cobalt.

27. Telephone records obtained from U.S. Cellular indicated the customer using (414) 419-8718 had requested a new telephone number on July 29, 2008, and was now assigned telephone

15

number (414) 419-0778 with the identical subscriber ("Sam Doe") and billing (a Chicago, IL address) information as (414) 419-8718.

28. On August 6, 2008, officers with the Oak Creek Police Department met with Joshua Anderson. Anderson had previously admitted he had accompanied Joshua Parent on over 20 occasions when Parent purchased heroin from Perkins. Anderson is familiar with Perkins and is able to recognize her voice. To confirm Perkins was now using telephone number (414) 419-0778, officers had Anderson place a phone call to that number. A female answered the phone and Anderson was able to verify that the voice on the phone was that of Perkins.

29. On August 14, 2008, case agents conducted surveillance at 2545 N. Buffum Street. [WE Energies records revealed the utilities at this address were in the name of Ethel Wilson.] Case agents observed Christine Perkins and Keith Wilson exit the rear door of the residence and enter a white Chrysler minivan bearing Wisconsin license plate 717-NJY. [A review of Wisconsin Department of Transportation (DOT) records revealed that this plate listed to Keith C. Wilson.]

30. On August 21, 2008, case agents attempted to conduct surveillance at 2545 N. Buffum Street. While driving east on W. Wright St., case agents observed a white Dodge Intrepid 4-door stopped at the mouth of the alley facing south in the 2500 block between N. Buffum St. and N. Richards Street. The vehicle displayed a Wisconsin front license plate number 717-NJY. This license plate had been previously observed on a white Chrysler minivan driven by Perkins and occupied by Keith Wilson. Case agents followed the Intrepid, and were able to identify the driver of the vehicle as Christine Perkins. Case agents followed the vehicle to about 5140

16

N. 66th Street. There, agents observed a black Pontiac Bonneville park behind the Dodge Intrepid and observed the Bonneville to be occupied by two white females. Case agents observed Christine Perkins exit the driver's seat of the Intrepid and approach the front passenger window of the Bonneville. Perkins then bent over and engaged in a brief conversation with the front passenger. Case agents observed Perkins conduct a brief hand-to-hand exchange with the front passenger. Perkins then walked back to her vehicle and entered the driver's seat.

31.     Case agents conducted a traffic stop of the Bonneville and spoke to the occupants of the vehicle. The front passenger of the vehicle (CS-1) told case agents CS-1 had gone to the area of N. 66th St. and W. Villard Ave. to meet her friend, "Pooh." [CS-1 later identified a photo of Christine Perkins as the person CS-1 knows as "Pooh."] CS-1 had been purchasing heroin from Perkins for about six months. CS-1 stated he/she bought two to three $20.00 quantities of heroin about three times per week. CS-1 identified the phone number of Perkins as (414) 419-0778. During her meeting with Perkins on 08/21/08, Perkins was accompanied by her boyfriend "Manny". [CS-1 identified a photo of Keith Wilson as the person CS-1 knows as "Manny".] CS-1 stated Wilson lives with Perkins in the area of N. Buffum St. and E. North Ave. and they both use heroin.

32.     Case agents searched the interior of the Bonneville. Agents located a woman's, white purse on the floor of the front passenger seat. Inside this purse, case agents located a small cloth bag. This bag contained two small aluminum folds containing a tan powdery substance, suspected heroin. In the same purse, case agents located a clear plastic bag containing a heroin

17

"kit." The "kit" consisted of a syringe, a metal "cooker," tweezers, tissue and a small cotton ball. Based upn my training and experience, I know a "kit" is commonly used by heroin users to prepare heroin for injection.

33.     On September 4, 2008, case agents re-interviewed CS-1. CS-1 stated Perkins and Wilson are usually together during heroin deals and that Wilson appears to be the one in charge of the transactions. In the previous six months, CS-1 had purchased heroin from Perkins and Wilson about three to five times per week. CS-1 normally purchased $20 to $40 worth of heroin at each transaction. CS-1 stated Perkins used cellular phone number 414-419-0778 and Wilson used cellular phone number 414-610-6547. CS-1 stated that Perkins and Wilson live with Wilson's family in the area of E. North Ave. and N. Buffum Street.

34.     CS-1 stated that on two separate occasions he/she has assisted Perkins with packaging heroin for sale. CS-1 stated Perkins would "cut" the heroin with powder from a pink capsule. [Case agents know that Dormin®, a common cutting agent added to heroin, comes in pink capsules.] Perkins and CS-1 placed the heroin into aluminum folds. When they finished, Perkins ended up with two sandwich bags that were half full of aluminum folds. CS-1 stated that in late July or early August, 2008, Perkins told CS-1 she was going to Chicago, IL to purchase heroin. Upon returning to Milwaukee, Perkins met with CS-1 and showed him/her a large block of tan powder that CS-1 knew to be heroin. CS-1 described the block as about 9" X 6" and about 1" thick and described it as being very compressed.

35.     On September, 5, 2008, case agents conducted a controlled buy from Keith Wilson and Christine Perkins. CS-1 called (414) 419-0778 and spoke to Keith Wilson about buying heroin.

18

A short time later, CS-1 called (414) 610-6547 and spoke to Wilson again. CS-1 knows this to be a number more frequently used by Wilson. Wilson directed CS-1 to come to the alley in the 2500 block of N. 29th St. to purchase the heroin. CS-1 was given $60 in pre-recorded buy money. CS-1 met with Perkins and Wilson in the alley at that location and gave Perkins the $60 in pre-recorded buy money. Perkins gave CS-1 six aluminum folds of suspected heroin. CS-1 turned the six aluminum folds over to case agents. The suspected heroin later tested positive for heroin with a weight of 0.7 grams in original packaging.

36. On October 16, 2008, case agents conducted surveillance at 2545 N. Buffum Street. Case agents observed Christine Perkins exit the gated front yard of the residence and enter the rear passenger-side seat of a silver 2003 Dodge Neon 4-door bearing Wisconsin License plate number 687-GZA that was parked on the east side of the street. [A review of Wisconsin DOT records revealed that this plate listed to Brian C. Lecus, of 6908 S. Tumble Creek Dr., Franklin, WI. on a 2003 silver Dodge Neon.] Case agents have observed this vehicle driven by Michael Lecus on several occasions. The vehicle remained parked on the street. A short time later, case agents observed a red 2003 Chevrolet Cavalier drive south on N. Buffum St. and pull to the curb in front of 2545 N. Buffum Street. Case agents observed Perkins exit the rear passenger seat of the silver Dodge Neon and walk across the street. Case agents observed Perkins conduct a brief hand-to-hand exchange with the occupants of the Cavalier. [Based on my training and experience, this exchange is consistent with an exchange of drugs for money.] After Perkins withdrew her hand from the interior of the vehicle, she immediately walked back across the street and re-entered the rear passenger seat of the Dodge Neon. The front

19

passenger of the vehicle appeared to be Keith Wilson and the driver of the vehicle was an unknown white male. Phone records obtained from U.S. Cellular show numerous telephone contacts between Keith Wilson's phone, (414) 610-1747, Christine Perkins phone, (414) 419-0778, and (414) 248-3793 between 10:24 a.m. and 10:28 a.m. [The subscriber for (414) 248-3793 is Brian Lecus of Franklin, WI. Case agents later identified the user of this phone as Michael Lecus.]

37. On November 6, 2008 case agents interviewed Jason J. Tyson regarding his knowledge of Perkins and Wilson. [Tyson viewed a booking photo of Christine R. Perkins and positively identified her as the person known as "Pooh." Tyson also viewed a booking photo of Keith C. Wilson and positively identified him as the person known as "Manny" or "Man Man".] Tyson stated he had known Perkins and Wilson for about six (6) or seven (7) months and began purchasing heroin from Wilson in about August, 2008. Tyson normally purchased about five (5) $10 quantities of heroin at a time. The most heroin Tyson purchased at one time was 10-15 foil folds. Tyson stated that when purchasing heroin from Wilson, he would place a call to (414) 419-0778. Tyson stated he had spoken to both Wilson and Perkins when calling that number, but usually spoke to Wilson regarding the heroin purchase.

38. Tyson stated Wilson and Perkins live at 2545 N. Buffum Street. Tyson had purchased heroin at that location in the past by going up to the rear door of the residence. Tyson had also met Wilson and Perkins near N. 29th St. and W. Wright Street. Tyson stated Perkins and Wilson drive a white Dodge Intrepid. Tyson also identified one of Perkins' and Wilson's customers as "Myles". [Tyson identified a booking photo of Myles Reno as the person known as "Myles."]

20

39.     On November 7, 2008, case agents met with Tyson and conducted a controlled buy of heroin from Keith Wilson and Christine Perkins. Tyson placed several phone calls to (414) 419-0778. There was no answer and the calls went to voicemail. Tyson stated it is not unusual for Wilson or Perkins to let their phone go unanswered, and that he would then drive to the alley behind their house and honk the horn. Tyson was given fifty (50) dollars in pre-recorded buy money. Tyson drove to the alley behind 2545 N. Buffum Street. While at that location, Tyson spoke to Christine Perkins on the phone. Perkins directed Tyson to go to the corner of N. Palmer St. and W. Center St. Tyson drove to that location. While waiting for Perkins and Wilson, case agents observed the white Dodge Intrepid used by Perkins and Wilson drive past the area. The Intrepid parked across from 2955 N. Palmer St., the address of Angela Perkins, a relative of Christine Perkins

40.     A short time later, the white Intrepid drove north on N. Palmer St. and stopped next to Tyson's vehicle. Wilson was driving and told Tyson to go to Perkins' aunt's house, which Tyson knows to be 2955 N. Palmer Street. Tyson drove to that location and parked. A few minutes later, Tyson placed a phone call to (414) 419-0778. The phone was answered by Perkins. Tyson told Perkins that he was parked outside. Perkins told Tyson that Wilson had gone to pick up the heroin. A short time later, Christine Perkins walked from the front of 2955 N. Palmer St. up to Tyson's vehicle. Perkins told Tyson that Wilson would meet him there. Perkins then entered the driver's seat of a silver Dodge Neon 4dr, bearing Wisconsin license plate 687-GZA [the vehicle used by Michael Lecus] and drove away. Approximately fifteen minutes later, case agents observed the white Dodge Intrepid park on Palmer St. across from

21

Tyson's vehicle. Tyson entered the rear driver's side door of the Dodge Intrepid, which was driven by Wilson. Tyson gave Wilson the $50 in pre-recorded U.S. Currency. Wilson gave Tyson five aluminum folds of heroin. While Tyson was walking back to his vehicle, case agents observed the silver Dodge Neon, bearing Wisconsin license plate 687-GZA, drive south on N. Palmer St. and park in front of Tyson's vehicle. Christine Perkins exited the driver's seat of the vehicle and case agents identified Michael Lecus as he exited the front passenger seat of the vehicle. Tyson turned the aluminum folds over to case agents. The substance tested positive for heroin with a total weight of 0.6 grams, including the original packaging.

41. On December 31, 2008, case agents interviewed Melissa Bartelme and Christian Andrejat at the Milwaukee HIDTA. Melissa Bartelme had been arrested by the Cudahy Police Department for Possession of Drug Paraphernalia and expressed a desire to cooperate with police regarding her knowledge of heroin trafficking activities. Bartelme said she first started snorting Oxycontin about 1 ½ years ago. About 4-5 months ago, she began snorting heroin. In about July 2008, Bartelme began buying heroin from Myles Reno. She would contact Reno by calling him at (414) 403-8830. Bartelme said she was buying two to three $10 bags per day and was sharing those with Andrejat. Reno also showed Bartelme and Andrejat how to inject heroin.

42. Bartelme stated she also purchased about one $10 bag of heroin from "Josh" per week. [Bartelme viewed a booking photo of Joshua Parent and identified him as the person she knows as "Josh".] After buying heroin from Reno for awhile, Bartelme accompanied Reno when he purchased heroin from "Pooh," his supplier. "Pooh" then told Bartelme she could

22

contact her directly. [Bartelme identified a photo of Christine Perkins as the person she knows as "Pooh".]

43. Bartelme then began purchasing heroin directly from Perkins. Bartelme would call Perkins and then meet her in the area of 71st and Villard Avenue. Upon meeting, Perkins would call her supplier who would come to meet Perkins. The supplier delivered the heroin to Perkins, and Perkins then delivered the heroin to Bartelme. Bartelme said if she purchased $100 worth of heroin, the supplier would give Perkins 11 $10 bags of heroin. Perkins would keep the one extra bag and also keep two more of the remaining ten as her commission for arranging the transaction.

44. Bartelme stated after Joshua Parent's arrest in July, 2008, Parent tried to "set Perkins up" by ordering 80 bags of heroin. Based upon my training and experience, I know this means Bartleme believes Parent had cooperated with police and tried to arrange for Perkins to be arrested. Bartelme said Myles Reno had already warned Perkins about Parent's arrest, so Perkins never met Parent. Bartelme said Perkins then changed her phone number and began telling people her supplier was no longer selling heroin, but Bartelme didn't believe her. Bartelme said she thought Perkins was getting the same amount of heroin from her supplier, but Perkins was then taking about half of the heroin out of each $10 bag and repackaging it. Perkins would then sell the extra heroin as another $10 bag. Bartelme continued purchasing about $100 worth of heroin from Perkins every day for about two months, but said the quality of the heroin and size of the bags had decreased.

23

45. Myles Reno then began taking Bartelme and Andrejat to meet another source, known to Bartelme as "Bonnie". [Bartelme identified a photo of Jeanette Perkins as the person she knows as "Bonnie".] After meeting Jeanette Perkins several times, Perkins told Bartelme that she recognized Bartelme after seeing her with Christine Perkins. Jeanette Perkins told Bartelme she was Perkins' aunt.

46. Bartelme stated they would meet Jeanette Perkins in the alley behind her house at 116 W. Wright Street. Perkins would come out to the car and use Bartelme's phone to contact her supplier. Bartelme stated she and Andrejat share a cell phone with the number (414) 916-1338. [Records obtained from AT&T indicated the subscriber for this phone is Rick Andrejat of 10208 Brookside D., Hales Corners, WI.] Bartelme stated the supplier was the same supplier with whom Christine Perkins had been dealing. Bartelme, Andrejat and Jeanette Perkins would then drive to meet the supplier. Jeanette Perkins obtained the heroin from the supplier and delivered it to Bartelme. Perkins kept one of the bags of heroin as a commission for arranging the transaction. Bartelme said the bags of heroin were larger and better quality than those she had been getting from Christine Perkins.

47. Bartelme said she had been buying between $30 and $200 worth of heroin from Jeanette Perkins and the supplier for the last few months. Most of the heroin was for her use and Andrejat's use, but if a friend needed some she might sell them a bag or two. Bartelme said Jeanette Perkins began acting nervously a little while ago after two of Bartelme's friends, "Josiah" and "Lauren" got arrested after buying heroin from Jeanette Perkins. [Milwaukee

24

Police Department reports show that Joshiah Porter and Lauren Bottoms were arrested near 1st and Wright on October 31, 2008 for delivering heroin to an undercover officer.]

48.    Bartelme stated she still contacted Christine Perkins for heroin on occasion. Perkins' boyfriend, "Manny" also sells heroin with Perkins. [Bartelme identified a photo of Keith Wilson as the person she knows as "Manny".] Bartelme stated that Wilson appears to be in charge because when there is a problem or Bartelme needed to be "fronted" heroin, they always had to speak to Wilson. Wilson and Perkins change their phone numbers often so that the police won't discovery their number.

49.    Case agents also interviewed Christian Andrejat who stated he was aware of a heroin dealer named "Bonnie." [Andrejat identified a photo of Jeanette Perkins as the person he knew as "Bonnie." Andrejat also identified a photo of Christine Perkins as a person he knows as "Pooh".] Andrejat believed Christine and Jeanette Perkins were related. To purchase heroin, Andrejat traveled to Jeanette Perkins' house, parked outside, honked the horn, and Perkins would come to the car. Perkins usually used Andrejat or Bartelme's cell phone to call her supplier. Andrejat or Bartelme told Bonnie how much heroin they wanted and Bonnie ordered it from her supplier. They usually ordered 11 "dime" bags for $100.00 and it came wrapped in foil. Jeanette Perkins has a sister who lives in a red house in the area of N. Palmer St. and E. Chambers, on the west side of the street, and is the third house from Chambers. Case agents know that address to be 2955 N. Palmer St., the address of Angela Perkins. At times, Bonnie goes to this house in order to obtain heroin for Andrejat and/or Bartelme.

25

50.     Andrejat is familiar with Myles Reno. Reno's cell phone number is 414-403-8830.
Andrejat went to school with Reno and knows that he sells small amounts of heroin to support
his own heroin habit. Andrejat uses Reno as a last resort for heroin because he cheats people.

51.     On January 28, 2009, case agent interviewed two confidential sources (hereinafter CS-3
and CS-4) regarding the drug trafficking activities of Christine Perkins, Keith Wilson and
Jeanette Perkins. [CS-3 and CS-4, respectively, identified a photograph of Christine Perkins as
"Poo-Poo," a photo of Keith Wilson as "Ready-Man" a/k/a "Man-Man" and a photograph of
Jeanette Perkins as "Bonnie".] CS-4 had known and purchased heroin from Perkins for about
3 years. CS-3 has known Perkins for approximately 1 ½ months.     Perkins used to sell
cocaine, but in about January 2008, Perkins paid CS-4 $250 to learn how to distribute heroin.
Since that time, Perkins sold "dime" quantities of heroin on the east-side of Milwaukee and
worked the distribution business with her boyfriend, "Ready-Man." CS-3 felt Perkins and
Wilson tried to make it appear Wilson controlled the operation, but it was Perkins who really
ran the business. Perkins and Wilson lived together in a residence on the west-side of the street
in the area of Buffum/Clark and Wright Streets. [Case agents identified the residence as 2545
N. Buffum St., Milwaukee.] Perkins and Wilson used telephone number 414-419-8447. [U.S.
Cellular records show the subscriber of this phone to be Sam Doe with an address of 8410 W.
Bryn Mawr Ave., Chicago, IL. I am aware from prior experience that U.S. Cellular lists Sam
Doe as the subscriber when there is no other subscriber name provided and that the address
listed is the corporate address of U.S. Cellular.]

26

52.     The telephone number changed about every 4 months. Either Perkins or Wilson answered the phone and took heroin "customer" orders. When Perkins answered the telephone, she met the heroin customer in the area of Buffum and Clark Sts. or Richards and Clark Sts. where she got into the customer's vehicle. Perkins typically had the heroin ready in her hand and her hand in her pocket. When Wilson answered the telephone, he also met the customer in the same area, but he had the customer get into his [Wilson's] vehicle. [CS-3 described Wilson's vehicle as a white vehicle, possibly a Chrysler with a black bra. Case agents identified the vehicle as a white 2002 Dodge Intrepid bearing Wisconsin license plate 717NJY registered to Keith Wilson at 2545 N. Buffum St., Milwaukee.]

53.     CS-3 stated Jeanette Perkins is Christine Perkins' aunt who also delivered heroin. Jeanette Perkins did not have a telephone. As a result, in order to contact Jeanette Perkins a heroin customer parked in front of Perkins' residence and honked the car horn. Jeanette would come out of the residence and enter the customer's car. Jeanette Perkins either used the customer's telephone or had the customer drive to a pay phone so Jeanette Perkins could contact the supplier. Jeanette Perkins had lost credibility with the source because of a payment she made to the source using counterfeit money. Jeanette Perkins told CS-3 she received the counterfeit money from "Missy and Chris" as payment for a heroin purchase. [CS-3 and CS-4 identified photographs of Melissa Bartelme as "Missy" and Christian Andrejat as "Chris".] Jeanette Perkins no longer received heroin "up front" from the source, but made the purchase directly from the source after she received money from the customer.

27

54. CS-3 and CS-4 also stated Jeanette Perkins' son, "Dejuan," occasionally sold heroin. [CS-3 and CS-4 identified a photograph of Dejuan Rogers as Jeanette Perkins' son, "Dejuan."] Dejuan sold mainly on weekends, but because "Dejuan" often "got burned" and lost money or drugs, he did not often sell. "Dejuan" used telephone number 414-304-4252. [Phone records from Sprint/Nextel indicated this phone was subscribed to by Rogers Dejaun of P.O. Box 54988, Irvine, CA 92619. Case agents know this to be a default address used by Sprint/Nextel when no subscriber address is provided.]

55. On February 5, 2009, case agents conducted a controlled buy of heroin from Jeanette Perkins. CS-3 was given $150 in pre-recorded buy money. CS-3 drove directly to 126 W. Wright St., but was unable to locate Perkins. CS-3 then drove to 2955 N. Palmer St. and exited the vehicle. [Case agents have previously identified this residence as belonging to Angela Perkins, a relative of Jeanette and Christine Perkins.] CS-3 knocked at the front door of 2955 N. Palmer St. and was admitted to the residence by Angela Perkins. A short time later, CS-3 exited the residence and returned to the vehicle. About two minutes later, Jeanette Perkins exited the residence and entered CS-3's vehicle. CS-3 drove to the corner of Buffum and Clark Street. Perkins exited the vehicle and surveillance observed her walk toward 2545 N. Buffum St., the address of Christine Perkins. A few minutes later, surveillance observed Jeanette Perkins exit the rear door of 2545 N. Buffum St. and return to CS-3's vehicle.

56. Surveillance followed CS-3's vehicle to the area of N. 1st and Locust Street where Jeanette Perkins exited the vehicle and walked to the residence at 2905 N. 1st Street. Jeanette Perkins entered the residence where she remained for a few minutes. Perkins then exited the

28

residence and re-entered CS-3's vehicle. CS-3 dropped Jeanette Perkins off at 2955 N. Palmer St. CS-3 gave case agents six aluminum folds containing suspected heroin. The suspected heroin tested positive for heroin with a total weight of 0.6 grams, including the original packaging. CS-3 believed the heroin had come from Christine Perkins based on the appearance and size of the foil folds of heroin.

57. On Wednesday, February 11, 2009, case agents conducted a controlled buy of heroin from Jeanette Perkins. CS-3 was accompanied by an undercover officer (hereinafter "UC") who was given $450.00 in pre-recorded buy money. The UC drove CS-3 to 126 W. Wright St., Perkins' residence. CS-3 approached the residence, but was unable to locate Perkins. CS-3 placed a phone call to (414) 263-1673. [Records obtained from AT&T indicated the subscriber for this number was Angela Perkins.] CS-3 asked to speak to Jeanette Perkins, who then came on the phone. CS-3 told Jeanette Perkins that CS-3 wanted to purchase grams of heroin and was close to Perkins' residence. Perkins directed CS-3 to come to the Value Village store at N. 3rd St. and W. North Avenue.

58. The UC and CS-3 parked at about 2320 N. 4th St. where CS-3 made another call to (414) 263-1673 and spoke to Jeanette Perkins. Jeanette Perkins stated that she was at the gas station across the street. Perkins was observed leaning into the passenger-side window of a red Ford pickup truck. Case agents observed Perkins conduct a brief hand-to-hand exchange with the occupants of the truck. [Based on training and experience, case agents know this motion to be consistent with an exchange of drugs for money.] Perkins then walked away from the truck and entered the front passenger seat of a white conversion van, bearing Wisconsin license plate

29

number 755-MZM. [This license plate listed to Angela Perkins of 2955 N. Palmer St., Milwaukee, WI.]

59. About 30 seconds later, Perkins exited the van and approached the undercover vehicle. Perkins entered the passenger side sliding door of the vehicle. CS-3 asked Perkins how many grams of heroin they could purchase. Perkins then inquired how many they wanted and said the price was $150.00 each. The UC told Perkins they wanted three grams.

60. Perkins used the UC's phone and placed a call to her supplier. Perkins then directed the UC to drive to N. 18th St. and W. Locust Avenue. Upon arrival, Perkins stated, "That's him in the green car." [Case agents observed a green Chevrolet Cavalier stopped on the east side of the street with the engine running and lights on.] The UC gave Perkins the $450.00 in pre-recorded buy money. Perkins exited the undercover vehicle and entered the green Chevrolet. Approximately four minutes later, Perkins exited the Chevrolet and returned to the UC's vehicle.

61. Perkins directed the UC to drive to the area of N. Palmer St. and E. Burleigh Street. Once at that location, Perkins told CS-3 and the UC that she now lives at 3140 N. Palmer St. on the first floor. She said if she were not at her sister's house [2955 N. Palmer St.], Jeanette Perkins would be at 3140 N. Palmer Street. Perkins handed CS-3 three individually wrapped small baggies containing a tan chunky substance, suspected heroin. CS-3 handed the three baggies to the UC. The UC drove to a pre-arranged meet spot and turned the suspected heroin over to case agents. The suspected heroin tested positive for heroin with a total weight of 3.1 grams, including the original packaging.

30

62.     On Wednesday, February 18, 2009, at about 1:00 p.m., case agents conducted a controlled buy from Keith Wilson. At about 1:15 pm, CS-3 placed a phone call to (414) 419-8447 [Subscribed to by Sam Doe and used by Keith Wilson and Christine Perkins] and ordered $60 worth of heroin from Wilson. Wilson told CS-3 to meet him in the alley behind 2545 N. Buffum Street. Case agents established surveillance at that location and observed Wilson exit the rear door of the residence.

63.     While awaiting Wilson in order to conduct the controlled buy, case agents observed a 2006 black Chevrolet Cobalt 2-door, bearing Wisconsin license plate 554-KSN, drive up to Wilson. A review of Wisconsin Department of Transportation records revealed this license plate number listed to Milton A. Bartelme, of Franklin, WI. (Case agents conducted a traffic stop of this vehicle on September 18, 2008. The vehicle was operated by Melissa Bartelme and Christian Adrejat.) Case agents observed Wilson approach the front passenger window of the Cobalt and conduct a brief hand-to-hand transaction with the occupants. A review of phone records revealed that at 1:09 p.m., an incoming phone call to (414) 419-8447, the phone being used by Wilson, from (414) 916-1338, a phone known to be used by Bartelme and Andrejat; at 1:21 p.m., an outgoing call occurred from Wilson to Andrejat, and at 1:24 p.m., an incoming call was received by Andrejat's phone from Wilson. Based upon my training and experience, I know the pattern of these calls would be consistent with Andrejat and Bartelme arranging a purchase of heroin from Wilson. Following the hand-to-hand transaction, the Chevrolet Cobalt drove out of the area and Wilson entered the rear door of 2545 N. Buffum Street.

31

64. A short time later, the UC drove CS-3 to the area of N. Buffum St. and E. Clarke St. and gave CS-3 $60 in pre-recorded buy money. CS-3 walked south in the alley in the 2500 block between N. Buffum St. and N. Richards St. Wilson met with CS-3 in the alley. Case agents observed CS-3 and Wilson conduct a brief hand-to-hand transaction. CS-3 then walked directly back to the UC's vehicle and gave the UC a small, clear plastic corner cut containing several small aluminum folds. The UC turned the corner cut over to case agents. The corner cut contained seven foil folds of suspected heroin which later tested positive for heroin with a total weight of 0.70 grams, including the original packaging.

65. On March 9, 2009, case agents conducted a controlled buy of heroin from Jeanette Perkins. CS-3 entered the UC's vehicle, and the UC drove CS-3 directly to 3140 N. Palmer St., the residence of Jeanette Perkins. CS-3 exited the UC's vehicle and entered the residence. A few minutes later, case agents observed CS-3 and Perkins exit the residence and enter the UC's vehicle. Perkins used CS-3's cellular phone and placed a call to her supplier. Perkins directed the UC to drive to Popeye's restaurant near 24th and North Avenue (2399 W. North Avenue, Milwaukee).

66. The UC drove directly to the Popeye's restaurant and parked in the parking lot. Perkins placed a call to the supplier. The UC gave Perkins the $450 in pre-recorded US currency. A few minutes later, case agents observed a purple 1997 Plymouth Voyager minivan drive onto the parking lot of the Popeye's restaurant. Perkins exited the UC's vehicle, entered the front passenger seat of the Voyager, and then returned to the UC's vehicle. The UC began to drive back toward Perkins' residence. While en route to her residence, Perkins handed CS-3 three

32

small, clear plastic corner cuts containing a tan chunky substance, suspected heroin. The UC dropped Perkins off at 3140 N. Palmer Street. The UC turned the three corner cuts of suspected heroin over to case agents. The content of the baggies later tested positive for heroin with a total weight of 3.2 grams, including original packaging.

67. On Thursday, March 12, 2009, case agents conducted surveillance of the alley behind 2545 N. Buffum St. when they observed a black 2006 Chevrolet Cobalt 2-door, bearing Wisconsin license plate 554-KSN, drive into the alley behind the residence. This auto is known by case agents to be used by Melissa Bartelme and Christian Andrejat. Case agents then observed a white 2002 Dodge Intrepid drive into the alley. The black Cobalt pulled to the side of the alley and the white Intrepid drove onto the parking slab at the rear of the residence, out of view.

68. Case agents observed Keith Wilson walk into the alley from the direction of the Intrepid and approach the passenger side of the Cobalt. Wilson bent down and conducted a brief hand-to-hand transaction with the occupants of the Cobalt. The black Cobalt then began to drive north in the alley toward E. Clarke Street. Case agents conducted a traffic stop of the Cobalt, approached the auto and confirmed that the driver was Melissa Bartelme, and were able to confirm the front passenger was Andrejat. Case agents were aware that Bartelme was out on bail on Wisconsin Circuit Court Case # 2008CF005266. On October 27, 2008, Court Commissioner Rosa Barillas set a condition of Bartelme's bail that she not to have contact with Andrejat. Bartelme's presence in the auto with Andrejat violated that condition of her bail.

33

69.     As case agents approached the auto, they observed Bartelme bend forward and reach down toward the floorboard with her right hand. Agents observed an unopened orange and white syringe package on Bartelme's right thigh. Bartelme had previously told case agents she injected heroin. Agents also observed Andrejat reach toward the floorboard with both hands. Case agents asked Bartelme to hand them whatever she had just purchased. Bartelme reached toward the floorboard with her right hand and retrieved three small aluminum folds containing suspected heroin. Case agents asked Bartelme if that was all of the heroin. Bartelme turned toward Andrejat and held out her right hand. Andrejat reached toward the floorboard with his left hand. Case agents observed him hand Bartelme one small, aluminum fold of suspected heroin, which she then handed to case agents.

70.     Bartelme and Andrejat were arrested. As Andrejat stepped from the vehicle after his arrest, case agents observed another orange and white syringe package on the passenger floorboard. As Andrejat was being handcuffed, a black Blackberry cellular phone fell from his left sweatshirt pocket. Case agents retained this phone which was later found to be assigned telephone number (414) 916-1338 [Subscribed to by Rick Andrejat and used by Andrejat and Bartelme.]

71.     Case agents searched the Chevrolet Cobalt. In the interior driver's door armrest, they located three additional small aluminum folds of suspected heroin. Case agents also located a light green and white ladies purse that was wrapped around the gear shift knob. In the purse case agents located a blue plastic water bottle containing numerous used syringes, spoons with burn marks on the bottoms and rubber and cloth tourniquets, all paraphernalia

34

associated with the use of heroin by injection. The heroin recovered from Bartelme and the vehicle tested positive for heroin with a total weight of 0.8 grams.

72.     After arrest, both Bartelme and Andrejat stated that the heroin recovered from them had just been purchased from Wilson. A consensual review of the text messages received and sent by Bartelme and Andrejat's phone revealed that Bartelme and Andrejat were trafficking to others the heroin that they purchased from Wilson.

73.     On Sunday, May 31, 2009, at about 12:38 p.m., case agents conducted surveillance at 2545 N. Buffum St. and observed a blue 2001 Mitsubishi Mirage 4-door, bearing Wisconsin license plates 593-GNG, parked on the rear parking slab behind the residence. [A review of Wisconsin DOT records revealed these license plates listed to Milton A. Bartelme and Diane M. Bartelme.] At about 12:43 p.m., case agents observed Keith Wilson exit the rear door of 2545 N. Buffum St. and approach the front passenger window of the Mitsubishi. Case agents observed Wilson reach into the vehicle and then withdraw his hand. The auto then drove away from the residence. Case agents followed the vehicle which made several erratic turns. Eventually, case agents were able to see that the driver of the vehicle was Melissa Bartelme and the passenger was Christian Andrejat.

74.     On Wednesday, July 1, 2009, case agents interviewed a cooperating defendant (hereinafter "CD-7") regarding CD-7's knowledge of drug trafficking in the Milwaukee area. I believe CD-7 to be truthful and reliable because his information has been corroborated by other aspects of this investigation.

35

75. CD-7 stated that Wilson sold heroin and that Wilson was often accompanied by "Pooh," whom CD-7 thought might be married to Wilson. [CD-7 viewed a photo of Christine Perkins and identified her as the person CD-7 knows as "Pooh."] CD-7 has also purchased heroin from Christine Perkins. CD-7 identified phone numbers used by Wilson and Christine Perkins as (414)419-8447, (414) 519-3544 and (414) 419-1619. [U.S. Cellular records show the subscribers of these two phones to be Sam Doe with an address of 841 W. Bryn Mawr Ave., Chicago, IL.] I am aware from prior experience that U.S. Cellular lists Sam Doe as the subscriber when there is no other subscriber name provided and that the address listed is the corporate address of U.S. Cellular. CD-7 stated that when CD-7 called those numbers, either Wilson or Christine Perkins answered the phone.

76. CD-7 stated after calling the phone number, CD-7 would talk to Wilson or Christine Perkins and arrange a place to meet in order to buy heroin. CD-7 has previously identified 2545 N. Buffum St. as the residence of Wilson and Christine Perkins. CD-7 had purchased heroin at that location on numerous occasions and would often go to the rear of the residence. Wilson or Christine Perkins exited the rear door of that residence and sold the heroin to CD-7 in the back alley.

77. CD-7 has also met Wilson and Christine Perkins at other locations to purchase heroin. Often, Wilson and Christine Perkins arrived in a white Dodge Intrepid with a black bra on the front of the vehicle. CD-7 would enter the vehicle and purchase heroin from Wilson or Christine Perkins. Wilson normally kept his supply of heroin in the crotch of his pants. Wilson reached into his pants, retrieved the bag and sold CD-7 whatever heroin CD-7 wanted. Wilson

36

normally had a bag of heroin about the size of a softball. Wilson and Christine Perkins only sold heroin in aluminum foil folds. CD-7 further stated Wilson is usually armed with a 9 m.m. Glock pistol which Wilson carries in the waistband of his pants.

78. At the end of May 2009, CD-7 went inside of the residence at 2545 N. Buffum St. to purchase heroin from Wilson. While inside the residence, CD-7 observed a black, plastic gun case which was open. Inside the case, CD-7 observed a large gun. CD-7 described the gun as looking like an "Uzi" with a silencer on the barrel and a large magazine extending from the bottom of the gun. CD-7 also observed a spare magazine for the gun in the case.

79. CD-7 has purchased heroin from Wilson and Perkins "hundreds" of times. CD-7 often purchased heroin from them up to four times per day and often purchased $100 to $200 worth of heroin at a time. The most heroin CD-7 bought at one time was about $400 worth. For every $100 CD-7 spent, CD-7 received 12 aluminum foil folds of heroin. The two extra folds were considered a "bonus" for spending a larger amount of money.

80. CD-7 then began purchasing heroin at a house on N. Palmer St. north of W. Burleigh Av. Case agents are aware that Jeanette Perkins lives at 3140 N. Palmer St. with her son, Dejuan Rogers. [CD-7 identified a photo of Dejuan Rogers as the person who lives at this house and identified a photo of Jeanette Perkins as a woman called "Auntie".] CD-7 has seen Jeanette Perkins with Keith Wilson and Christine Perkins in the past. On over ten occasions in the past, CD-7 has actually received the heroin from Dejuan Rogers or Jeanette Perkins.

81. On Monday, September 7, 2009, at about 9:45 a.m., case agents conducted a controlled buy of heroin from Sherry Wilson. At about 9:59 a.m., CS-4 placed a phone call to (414) 215-

37

8702. [Sprint/Nextel records revealed the subscriber for this phone was Tasha Smith of P.O. Box 54988, Irvine, CA 92619. I am aware that this address is the default address for Boost Mobile phones when the user does not provide a valid billing address.] CS-4 knows this phone number to be used by Christine Perkins and others to distribute heroin. The phone was answered by a woman CS-4 knows as "Nonnie," but whose real name is "Sherry." [CS-3 and CS-4 subsequently viewed a booking photo of Sherry Wilson and identified her as the person CS-4 knows as "Nonnie" or "Sherry."]

82. CS-4 asked who was on the phone and Wilson initially identified herself as "Pooh" (Christine Perkins). Sherry Wilson directed CS-4 to the corner of N. Palmer St. and E. Clarke Street. Case agents gave CS-4 $100 in pre-recorded United States currency. Case agents observed and identified Sherry Wilson as she exited the rear door of 2545 N. Buffum St. and entered the driver's seat of a white Dodge Intrepid, bearing Wisconsin license plates 717-NJY. The vehicle is known to be used by Keith Wilson and Christine Perkins.

83. Sherry Wilson drove to the corner of N. Palmer St. and E. Clarke St. and stopped the vehicle in the middle of the street next to CS-4's vehicle. CS-4 exited CS-4's vehicle and approached the driver's window of the Intrepid. Sherry Wilson handed CS-4 a clear plastic bag containing several aluminum folds of suspected heroin and CS-4 handed Wilson the $100 in pre-recorded U.S. currency. Sherry Wilson then returned to 2545 N. Buffum Street. CS-4 handed case agents the clear plastic baggie containing six aluminum folds of suspected heroin. These later tested positive for heroin with a total weight of 2.0 grams, including the original packaging.

84. I am aware of a red 1997 GMC Yukon bearing Wisconsin license plate number 712-PRZ, driven by Wilson during drug related activities. [A review of Wisconsin Department of Transportation records revealed that this vehicle lists to Sherry Wilson.] On August 4, 2009, case agents observed the red Yukon parked behind 2545 N. Buffum. Agents observed Wilson exit the rear door of 2545 N. Buffum and enter the driver's seat of the red Yukon. On this same date, case agents observed Wilson drive in the red Yukon to the 2800 block of Richards Street where Wilson conducted a hand-to-hand transaction with an unidentified white male. Based upon my training, experience, and familiarity with the investigation, I believe that Wilson had conducted a sale of heroin. During an interview, CS-4 told case agents that Wilson had showed CS-4 a high capacity Mac-11 semi-automatic pistol that Wilson stored in the back of his red Yukon truck.

85. On Friday, September 11, 2009, case agents conducted a controlled buy of heroin from Christine Perkins. CS-4 placed a recorded and monitored phone call to (414) 215-8701. [Sprint/Nextel records revealed the subscriber for this phone was Rick Moon of P.O. Box 54988, Irvine, CA 92619. I am aware that this address is the default address for Boost Mobile phones when the user does not provide a valid billing address. Law enforcement database records also revealed that Keith Wilson has previously used aliases of Keith Moon and Ricky Wilson.] CS-3 and CS-4 have identified this phone as being used by Keith Wilson and Christine Perkins. Christine Perkins answered the phone. Perkins agreed to sell six $20 quantities of heroin to CS-4 for $100. CS-4 was given $100 in pre-recorded United States currency. A short time later, CS-4 received an incoming call from (414) 215-8702. CS-4

39

answered the phone and spoke to Christine Perkins. CS-4 told Perkins CS-4 was in the area of Perkins' residence and asked where Perkins wanted CS-4 to go. Perkins told CS-4 she couldn't send anyone to meet CS-4 because "Nonnie" [Sherry Wilson] was in the shower. CS-4 asked if Perkins wanted CS-4 to come to her residence, and Perkins told CS-4 "no," stating it was too "hot," [Case agents know drug traffickers to use the term "hot" to refer to times when there are police officers in the area.] Perkins told CS-4 she would call back in a few minutes. A few minutes later CS-4 received an incoming call from (414) 215-8702. Perkins told CS-4 to go to the corner of N. Palmer St. and E. Hadley Street. CS-4 then received an incoming call from (414) 215-8701. Keith Wilson told CS-4 he was on his way. Case agents observed Keith Wilson exit the rear door of 2545 N. Buffum St. and enter the driver's seat of the white Dodge Intrepid, bearing Wisconsin license plates 717-NJY [Registered to Keith Wilson and used by Wilson and Christine Perkins.] Wilson drove to the corner of N. Palmer St. and E. Hadley St.

86.     CS-4 exited CS-4's vehicle and entered the front passenger seat of the Dodge Intrepid. CS-4 handed Wilson the $100 in pre-recorded currency. Wilson produced a clear plastic bag and handed CS-4 six aluminum foil folds of suspected heroin. CS-4 began to exit the Dodge Intrepid and told Wilson CS-4 would call him later regarding the "other thing." [Case agents are aware that Wilson has asked CS-4 to acquire firearms and other items for him.] CS-4 asked Wilson for what kind of firearm did Wilson want an extended magazine. CS-4 asked if the firearm was a [Ruger] "P89." Wilson told CS-4 "no," it was for a ".40 Glock". CS-4 told Wilson CS-4 had to talk to some other people about getting the magazine. CS-4 gave case agents the

40

six aluminum folds of suspected heroin. They later tested positive for heroin with a weight of 1.2 grams, including the original packaging.

87.     On September 18, 2009, case agents conducted a controlled buy of heroin from Angela Perkins. CS-4 placed a call to 414-610-7661 [U.S. Cellular records show the subscriber of this phone to be Sam Doe with an address of 8410 W. Bryn Mawr Ave., Chicago, IL. I am aware from prior experience that US Cellular lists Sam Doe as the subscriber when there is no other subscriber name provided and that the address listed is the corporate address of U.S. Cellular.] CS-4 identified this number as being used by Angela Perkins, and spoke to a subject identified as "Tracy." CS-4 told "Tracy" CS-4 was going to come over [to buy heroin]. CS-4 was given $60 in pre-recorded buy money.

88.     CS-4 arrived at Perkins' residence at 2955 N. Palmer St., Milwaukee, WI. Angela Perkins answered the door and allowed CS-4 to enter the residence. CS-4 asked for "seven" [seven $10 bindles of heroin]. Angela Perkins counted out 5 bindles and told CS-4 she needed about 4-5 minutes to put together another 2 bindles. CS-4 gave Perkins $60 in pre-recorded funds and left the residence with the 5 bindles. CS-4 handed case agents the 5 small aluminum foil folds containing suspected heroin. These later tested positive for heroin with a total weight of 0.8 grams, including the original packaging.

89.     On Thursday, September 24, 2009, case agents conducted a controlled buy of heroin from Christine Perkins. CS-4 placed a recorded and monitored call to (414) 215-8702. [This phone had previously been answered by Christine Perkins.] The phone was answered by Keith Wilson. CS-4 ordered $100 worth of heroin. Wilson directed CS-4 to go to the corner of

41

N. Richards St. and E. Hadley St. CS-4 was then given $100 in pre-recorded United States currency. Case agents followed CS-4 directly to the corner of N. Richards St. and E. Hadley St. CS-4 placed an outgoing call to (414) 215-8702. The phone was answered by Christine Perkins. CS-4 told Perkins CS-4 had arrived. Case agents observed Christine Perkins exit the rear door of 2545 N. Buffum St., and enter the driver's seat of the white Dodge Intrepid. Perkins drove to the 2700 block of N. Richards St., parked, and entered CS-4's vehicle. Perkins directed CS-4 to drive around the block. While driving, CS-4 handed Perkins the $100 in pre-recorded currency. Perkins handed CS-4 six aluminum foil folds of suspected heroin.

90.     CS-4 dropped Perkins off at her vehicle. Perkins exited CS-4's vehicle and approached the front door of 2758 N. Richards Street. [We Energies records revealed that the utilities at this address were in the name of Charles Leach. In June and July 2008, case agents had conducted surveillance of Keith Wilson and Christine Perkins at 2530 N. 29th Street. The utilities at that residence were also in the name of Charles Leach.] CS-3 and CS-4 told case agents that this residence was used by Christine Perkins, Keith Wilson, and Sherry Wilson to sell and store heroin. Case agents observed Perkins sitting on the front porch of the residence and observed the front door to be open. Case agents then observed a black male exit the front door of 2758 N. Richards St. and have a brief conversation with Perkins. CS-4 gave case agents the six aluminum folds of suspected heroin. They later tested positive for heroin with a total weight of 0.8 grams, including the original packaging.

91.     On Wednesday, September 30, 2009, case agents conducted a controlled buy of heroin from Keith Wilson. CS-4 placed a recorded and monitored call to (414) 215-8702. The phone

42

was answered by Keith Wilson. CS-4 ordered $100 worth of heroin. Wilson directed CS-4 to go to the corner of N. 1st St. and W. Clarke Street. CS-4 was given $100 in pre-recorded United States currency. Approximately 30 minutes later, case agents observed the white Dodge Intrepid stopped in the street in front of "Get Fresh Clothing and Apparel," owned and operated by Perkins and Wilson. The Intrepid drove to the corner of N. 2nd St. and W. Wright St., Milwaukee, WI. At this same time, CS-4 received an incoming call from Wilson. Wilson told CS-4 to go to the corner of N. 2nd St. and W. Wright Street. CS-4 drove there, exited the vehicle and approached the driver's window of the Dodge Intrepid. CS-4 handed Wilson the $100 in pre-recorded U.S. currency. Wilson then handed CS-4 six aluminum folds of suspected heroin. CS-4 handed case agents the six aluminum folds of suspected heroin. These later tested positive for heroin with a total weight of 1.0 grams, including the original packaging.

92. On Monday, November 16, 2009, case agents met with CS-4 regarding the purchase of heroin from Christine Perkins, Keith Wilson and others involved in their heroin drug Trafficking Organization. CS-4 placed a recorded and monitored phone call to (414) 215-8701. The call was answered by Christine Perkins. CS-4 asked Perkins where she wanted CS-4 to go [to purchase heroin]. Perkins told CS-4 to call her right back because she had to get "ready." Case agents believed this to mean that Perkins had to package or prepare heroin for sale.] CS-4 told Perkins CS-4 would call when CS-4 got into Perkins' neighborhood. CS-4 was given $100 in pre-recorded currency and then drove to the corner of N. 1st St. and W. Clarke Street.

93. CS-4 placed a phone call to (414) 215-8701. The phone was answered by Keith Wilson. CS-4 asked Wilson where to meet him. Wilson asked CS-4 how much money CS-4 had to

43

spend. CS-4 told Wilson $100. Wilson told CS-4 to meet him at "P and G." [Case agents know this to be a reference to the corner of N. Palmer St. and E. Garfield St.] CS-4 drove to that area and placed a call to (414) 215-8701. CS-4 told Wilson CS-4 had arrived.

94. A short time later, case agents observed Keith Wilson exit the rear door of 2545 N. Buffum Street. Wilson entered the driver's seat of a white Dodge Intrepid, bearing Wisconsin license plates of 717-NJY. [Case agents are aware that this license plate lists to Wilson.] Case agents followed Wilson to the area of N. Martin Luther King Jr. Drive. At that time, CS-4 received an incoming call from (414) 215-8701. Wilson told CS-4 to come "toward 3." [Case agents know the reference to "3" to be 3rd St., another name for N. Martin Luther King Jr. Dr.] While doing so, CS-4 observed Wilson turn south from W. Garfield St. into the alley between N. 1st St. and N. 2nd Street. CS-4 followed Wilson into the alley. CS-4 exited CS-4's vehicle and approached the driver's window of the Intrepid. Case agents observed CS-4 make a brief hand-to-hand exchange with Wilson.

95. CS-4 then returned to a pre-determined meet location and gave case agents a clear, plastic baggie containing 12 aluminum foil folds of suspected heroin. This later tested positive for heroin with an original weight of 1.5 grams.

96. Case agents continued to follow Wilson. Wilson drove to Palmer Center Foods at 200 E. Center St. and then drove to the alley behind 3140 N. Palmer Street. [Case agents are aware this is the residence of Jeanette Perkins and believe that Jeanette Perkins sells heroin with Christine Perkins and Keith Wilson. Case agents also believe Keith Wilson and Christine Perkins store heroin at this residence.] Agents lost sight of Wilson for about two minutes. Case

44

agents then observed the trunk of the Intrepid to be open and observed Keith Wilson reaching into the trunk. Wilson then closed the trunk and re-entered the driver's seat of the Intrepid. [Based on my training, experience and familiarity with the investigation, I believe Wilson was at 3140 N. Palmer St. to pick up heroin or proceeds of heroin sales or to drop off heroin for sale at that residence.] Wilson left the alley about 30 seconds later and drove back to the alley behind 2545 N. Buffum Street. Case agents then observed Wilson enter the rear door of 2545 N. Buffum Street.

VII.    **CONCLUSIONS**

97.    Based on the foregoing, I believe there is probable cause to believe the individuals identified in ¶6 above have committed violations of federal drug trafficking offenses, including violations of Title 21, United States Code, Sections 841 and 846. More specifically, I believe there is probable cause to believe that beginning sometime in March 2008 and continuing until the present, in the Eastern District of Wisconsin, and elsewhere, the individuals identified in ¶6 above have knowingly and intentionally conspired to possess with the intent to distribute and distribute in excess of one (1) kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, and during such conspiracy, death and serious bodily injury resulted from the use of such heroin, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A).

98.    Furthermore, I believe there is probable cause to believe that located in the locations described in ¶7 above there is evidence of drug trafficking and fruits, instrumentalities and

45

proceeds of drug trafficking, all of which is detailed more specifically in Attachment A - Items to be seized.

46

# ATTACHMENT A - ITEMS TO BE SEIZED

1.   Drugs;

2.   Packaging materials, paraphernalia, and other contraband related to drug trafficking and distribution;

3.   Proceeds of drug trafficking activities, including United States Currency, financial instruments, jewelry;

4.   Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the transportation, ordering, possession, sale, or distribution of controlled substances;

5.   Personal telephone books, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

6.   Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the prices, quantity, and/or times when controlled substances were obtained transferred or sold distributed, and/or concealed;

7.   Documents and deeds reflecting the purchase or lease of real estate, vehicles, jewelry or other items obtained with the proceeds from organized criminal and drug trafficking activities;

8.   Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones, calling cards, and other communication devices which evidence participation in organized criminal and drug trafficking activities;

9.   Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents and keys.

10.  Firearms